**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 CR 581** |
| | ) | |
| **ISMAEL RANGEL-RODRIGUEZ** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Ismael Rangel-Rodriguez,[1] a native of Mexico, was indicted on September 12, 2018 under 8 U.S.C. § 1326(a) for allegedly reentering the United States after he was previously found to be in the country illegally. Rangel has moved to dismiss the indictment on the basis that the underlying removal was legally defective under the Supreme Court's recent ruling in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). He argues that, because of the defect, his prior removal cannot, as a matter of law, serve as an element of the present charge. After reviewing the record and controlling authority, the Court concludes that the motion must be denied.

**Background**

On November 26, 2010, Rangel was arrested for driving on a suspended license and other offenses. United States Immigration and Customs Enforcement (ICE) initiated removal proceedings by serving the defendant with a notice to appear (NTA) the same day. The NTA directed Rangel to appear before an immigration judge on a date and time "to be set."

---

[1] Both parties refer to the defendant simply by the first of his surnames. This Court will do the same.

The parties appear to agree that ICE subsequently issued three hearing notices that specified the times, dates, and locations of proceedings that occurred in the following months, though there is some disagreement about whether each was properly served on Rangel. The parties also agree that Rangel appeared by video conference at three hearings in February and March 2011. After the third hearing, which occurred on March 15, 2011, Rangel was released on bond. The parties disagree about whether Rangel was notified of his next court date at the time of his release, and neither side has obtained a transcript of the hearing.

The record says little about what happened in the year following Rangel's bond.[2] And neither party has produced records of any hearings that may have occurred during the remainder of 2011, though Rangel offers the observation that ICE's internal record system suggests no such hearings occurred.[3]

The next relevant proceeding included in the record was a hearing in February 2012. Specifically, on February 22, 2012, eleven months after Rangel was released on bond, the immigration court conducted a removal hearing and ordered him removed from the United States. But Rangel was not present at the removal hearing because he had been arrested on a DUI charge in late January and was in state custody pending trial. In short, he was ordered removed *in absentia*. Rangel was then convicted of DUI in August 2012 and served another year in state custody before he was released to ICE

---

[2] At oral argument, the government suggested that this gap is itself the result of Rangel's release on bond; the Department of Homeland Security apparently retains records of hearing notices only while a respondent is in custody and his release caused the department's record to be incomplete.

[3] The government assures the Court that a request was made to the Department of Homeland Security in November 2018 for records from Rangel's case. It suggests that the delay may be a product of then-ongoing partial government shutdown. In any case, the Court concludes that the motion to dismiss can be resolved on the current record.

custody in September 2013. ICE caused him to be physically removed from the United States on September 24, 2013.

Two days after his removal, Rangel was again apprehended in the United States. ICE reinstated the removal order and immediately removed him to Mexico.

At some point between then and August 2018, Rangel again reentered the United States. He was arrested by Chicago police on August 13, 2018. A grand jury then indicted him on a charge of illegal reentry under 8 U.S.C. § 1326(a).

### Discussion

In relevant part, section 1326(a) makes it a crime when "any alien who . . . has been deported[ ] or removed . . . thereafter . . . enters, or attempts to enter, or is at any time found in, the United States . . . ." *Id.* Rangel has moved to dismiss the indictment on the basis that his initial removal was defective under *Pereira*, 138 S. Ct. at 2105. In *Pereira*, the Supreme Court held, in an arguably analogous context, that the NTA statute, 8 U.S.C. § 1229(a), requires date and time information be provided to a respondent in order for that document to have effect. Rangel alleges that the government's failure to include time and date information in the 2010 NTA rendered it legally ineffective and that as a result, his removal following issuance of that NTA cannot, as a matter of law, serve as a basis for this indictment. The government contends that *Pereira* is readily distinguishable and ought not to apply here. Alternatively, it contends that 8 U.S.C. § 1326(d) sets out specific statutory requirements for collaterally attacking the removal order underlying an indictment like this one and that Rangel has failed to satisfy those requirements. The Court addresses each of these arguments in turn.

## A.     *Pereira*'s applicability

At the threshold, the parties dispute whether *Pereira* is applicable here at all.

### 1.     The Supreme Court's holding in *Pereira*

*Pereira* involved a challenge to a removal order under the "stop-time" rule from 8 U.S.C. § 1229b.  *See Pereira*, 138 S. Ct. at 2110.  Section 1229b(b)(1)(A) provides relief from deportation for noncitizens who have "been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application" for cancellation of removal.  8 U.S.C. § 1229b(b)(1)(A).  The stop-time rule is a carve-out that stops a noncitizen from accruing time toward eligibility for cancellation of removal "when the alien is served a notice to appear under section 1229(a) of this title."  *Id.* § 1229b(d)(1).

Section 1229(a), entitled "Notice to appear," sets out the requirements for the written notice that "shall be given . . . to the alien" who is subject to removal proceedings.  *Id.* § 1229(a).  Among other things, section (1)(G)(i) requires an NTA to include "[t]he time and place at which the removal proceedings will be held."  *Id.* § 1229(a)(1)(G)(i).  Before *Pereira*, agency regulation and practice did not follow the letter of this requirement.  Specifically, the relevant regulation required only that NTAs provide "[t]he time, place, and date of the initial removal hearing, *where practicable*."  62 Fed. Reg. 10332 (1997) (emphasis added).  And, in recent years, DHS virtually never deemed providing such information to be practicable.  *See Pereira*, 138 S. Ct. at 2111.

Accordingly, the NTA served upon the appellant in *Pereira* lacked information about the time and location of the hearing at which he was required to appear.  The Supreme Court held in *Pereira* that (1) the agency's interpretation of the statute was not

owed deference under *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because the relevant requirements of sections 1229b(d)(1) and 1229(a) were wholly unambiguous and (2) "[a] notice that does not inform a noncitizen when and where to appear for removal proceedings is not a 'notice to appear under section 1229(a)' and therefore does not trigger the stop-time rule." *Pereira*, 138 S. Ct. at 2110. The Court reversed and remanded for reconsideration of Pereira's application for cancellation of removal.[4]

### 2. *Pereira*'s application in this case

The government argues that *Pereira*'s holding is narrowly applicable only in the stop-time context and therefore irrelevant to Rangel's indictment for violating section 1326(a). It points to the Supreme Court's characterization of "[t]he narrow question" in *Pereira*: "If the government serves a noncitizen with a document that is labeled 'notice to appear,' but the document fails to specify either the time or place of the removal proceedings, does it trigger the stop-time rule?" *Id.* Likewise, the Court's answer to that question—its holding—specifically refers to the stop-time rule. *Id.* ("No. [Such inadequate] notice . . . does not trigger the stop-time rule."). In the government's view, "the Supreme Court's repeated use of the same phrase—'trigger the stop-time rule'— cannot be accidental, and it leaves no doubt that *Pereira* only addressed the question of what triggers the stop-time rule." Gov.'s Br. in Opp., dkt. no. 10, at 8. And the government emphasizes that several district courts assessing this question have concluded that *Pereira* is inapplicable to NTAs for the purposes of a section 1326(a)

---

[4] The parties do not dispute whether *Pereira* should be read to have retroactive effect. The Court need not reach this issue except to note that retroactive effect is "overwhelmingly the norm." *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535 (1991).

charge.  *See, e.g.*, *United States v. Morales-Hernandez*, No. CR-18-00365-TUC-RCC, 2018 WL 4492377 (D. Ariz. Sept. 18, 2018); *United States v. Fernandez*, No. 7:18-CR-11-BO-1, 2018 WL 4976804 (E.D.N.C. Oct. 15, 2018).

Rangel proposes a more expansive reading of *Pereira*.  He argues that, regardless of the Supreme Court's characterization of the question before it, *Pereira* construed the requirements of section 1229(a), which applies broadly to the initiation of deportation proceedings.  After all, *Pereira* reasoned that section 1229 "speak[s] in definitional terms" about the meaning of the words "notice to appear," and that, therefore, when that phrase is "used elsewhere in the statutory section, including as the trigger for the stop-time rule, it carries with it the substantive time-and-place criteria . . . ."  *Pereira*, 138 S. Ct. at 2116.  Rangel then argues that "[w]ithout a valid charging document initiating removal proceedings, jurisdiction *never* vests in the immigration court," rendering any action taken pursuant to such a document null and void.  Def.'s Br. in Supp., dkt. no. 8, at 5.

In other words, Rangel asserts that because the NTA served upon him lacked time and date information, it did not meet the statutory requirements of section 1229(a) and thus did not vest the immigration court with jurisdiction to order removal.  He contends that the removal order was therefore invalid and cannot not serve as a basis for the present section 1326(a) charge.  Rangel notes that several district courts have held such a defect sufficient to require dismissal of a charge under the statute.  *See, e.g.*, *United States v. Quijada-Gomez*, No. 2:18-cr-00110-SAB, 2018 WL 6706680, at *6-8 (E.D. Wash. Dec. 20, 2018); *United States v. Lopez-Urgel*, No. 1:18-CR-310-RP, 2018 WL 5984845, at *5-6 (W.D. Tex. Nov. 14, 2018); *United States v. Virgen-Ponce*,

320 F. Supp. 3d 1164, 1165-66 (E.D. Wash. 2018).

As the parties correctly point out, district courts have disagreed regarding the reach of *Pereira*'s holding.  Some courts have concluded that *Pereira* is limited to its context and thus construes section 1229(a)'s requirements only for the purposes of the stop-time rule.  *See, e.g.*, *United States v. Chavez*, No. 17-CR-40106-01-HLT, 2018 WL 6079513 (D. Kan. Nov. 21, 2018).  Others have found that *Pereira*'s holding extends to contexts beyond the stop-time rule, including to NTAs that initiated the removal proceedings underlying 1326(a) charges.  *See, e.g.*, *United States v. Tzul*, 345 F. Supp. 3d 785 (S.D. Tex. 2018).  And no court of appeals has yet addressed the question in the context of an illegal reentry indictment.

The Court concludes that *Pereira* is applicable here.  Rangel's argument appears to parallel the district courts' reasoning in *Zapata-Cortinas* and *Quijada-Gomez*.  In *Zapata-Cortinas*, the court weighed the same arguments presented here and concluded that "it would be incongruous to interpret the plain language of [section] 1229(a)(1) differently depending on the [g]overnment's stated purpose . . . ."  *Zapata-Cortinas*, 2018 WL 6061076, at *6.  The Court agrees with the conclusion in that case that "there is no reason to construe 'Notice to Appear' differently for the purposes of the '[i]nitiation of removal proceedings'—notably the *title* of [section] 1229—than when applying it in the 'stop-time' context."  *Id.* (citing *Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give the[ ] same words a different meaning for each category [under the statute] would be to invent a statute rather than interpret one.")); *see also United States v. Larios-Ajualat*, No. 18-10076-JWB, 2018 WL 5013522, at *4 (D. Kan. Oct. 15, 2018) (reaching the same conclusion).

7

Likewise, the district court in *Quijada-Gomez* reasoned that, "while Pereira's holding is narrow in that it only addresses date and time information, it operates as a firm and clear syllogism." *Quijada-Gomez*, 2018 WL 6706680, at *2. That is, the court concluded that the portions of the Supreme Court's analysis interpreting section 1229(a) (which governs notices to appear generally) rather than section 1229(b)(d)(1) (which governs the stop-time rule) were applicable and binding on its analysis of the illegal reentry indictment. *Id.* This Court agrees.

There is, of course, contrary authority. The Sixth Circuit recently addressed the applicability of *Pereira* to immigration courts' jurisdiction. *See Hernandez-Perez v. Whitaker*, 911 F.3d 305, 314 (6th Cir. 2018). After reviewing the statutory and regulatory landscape, that court concluded that the Board of Immigration Appeals' recent opinion in *Matter of Bermudez-Cota*, 27 I. & N. Dec. 441 (B.I.A. 2018), was owed deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *Id.* In *Bermudez-Cota*, the BIA held that an NTA "that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings and meets the requirements of [8 U.S.C. § 1229(a)], so long as a notice of hearing specifying this information is later sent to the alien." *Bermudez-Cota*, 27 I. & N. Dec. at 447. The Sixth Circuit opined that "*Pereira* is an imperfect fit in the jurisdictional context and it does not mandate a different conclusion than the one already reached by this court [before *Pereira*]." *See Hernandez-Perez*, 911 F.3d at 314. It therefore concluded "that jurisdiction vests with the immigration court where, as here, the mandatory information about the time of the hearing, *see* 8 U.S.C. § 1229(a), is provided in a Notice of Hearing issued after the NTA." *Id.* at 314-15. The government

emphasizes that, as in *Hernandez-Perez*, Rangel was served with hearing notices that included time and date information.

*Pereira*, however, is binding on this Court. And *Pereira*'s unambiguous construction of 1229(a) has broader implications than the government and *Hernandez-Perez* suggest. Specifically, the Supreme Court held that "Section 1229(a) . . . speak[s] in definitional terms" using "quintessential definitional language." *Pereira*, 138 S. Ct. at 2116. It would be difficult to draft a clearer statement that section 1229(a) was intended to define the minimum requirements of an NTA. And the Supreme Court dispelled any remaining lack of clarity by explaining, near the beginning of its analysis of the government's protests to its holding, that "when the term 'notice to appear' is used elsewhere in the statutory section, *including* as the trigger for the stop-time rule, it carries with it the substantive time-and-place criteria required by [section] 1229(a)." *Id.* (emphasis added). If the Court intended to adopt the hyper-narrow application now proposed by the government, it would not have used the word "including," which suggests that the stop-time context is only one of a set of legally relevant circumstances.

This Court concludes that *Pereira*'s construction of section 1229(a) applies here. The 2010 NTA that initiated the underlying proceeding against Rangel was legally defective because it lacked the time and date information unambiguously required by 8 U.S.C. § 1229(a)(1)(G)(i).

## B.     Section 1326(d)'s bars to collateral attack

Contrary to Rangel's contentions, the analysis does not stop there. Even though the Court has concluded that *Pereira* applies and that the 2010 NTA was defective, it

must still assess the legal significance of that defect. Specifically, the Court must first determine whether the defective NTA obviates the need to assess Rangel's motion under section 1326(d), which outlines three requirements that must be satisfied before a section 1326(a) indictment may be attacked collaterally. If section 1326(d) does apply, the Court must determine whether Rangel has satisfied its requirements.

### 1. Rangel must satisfy section 1326(d)'s requirements

Even among district courts that have concluded that *Pereira*'s section 1229(a) holding applies in the context of a section 1326 charge, there is significant disagreement on the legal impact of a defective NTA. Some district courts have concluded, as Rangel argues, that indictments based on previous removals initiated by defective NTAs must be dismissed because the underlying proceeding was conducted without subject-matter jurisdiction, which these courts note is an issue typically not subject to forfeiture or waiver. *See, e.g.*, *Tzul*, 345 F. Supp. 3d at 792. Other courts have found that, even if a defective NTA may have caused jurisdictional problems, a defendant seeking to dismiss an indictment must nonetheless establish each of the elements of section 1326(d) to collaterally attack the prior removal proceeding. *Compare, e.g.*, *Zapata-Cortinas*, 2018 WL 6061076, at *12 (holding that, although predicated on an NTA that was defective under *Pereira*, section 1326(d) applied and was not satisfied), *with United States v. Erazo-Diaz*, No. CR-18-00331-001-TIC-RM (LAB), 2018 WL 6322168, at *5 (D. Ariz. Dec. 4, 2018) (applying Ninth Circuit precedent and holding that a motion to dismiss based on a defective NTA satisfied the requirements of section 1326(d)).

This Court concludes that Rangel must satisfy section 1326(d) to collaterally

attack the removal order underlying his section 1326(a) charge. The arguments in favor of applying the requirements of section 1326(d) are stronger than those against.

The Court begins with the text of the statute. Section 1326(d) establishes the requirements for a collateral challenge to the validity of the underlying deportation order may be made:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order [underlying the indictment] unless the alien demonstrates that—
>> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).

Enacted in response to the Supreme Court's decision in *United States v. Mendoza-Lopez*, 481 U.S. 828, 834-35 (1987), subsection (d) serves as a release valve for due-process concerns stemming from indictments premised on invalid removal orders. In *Mendoza-Lopez*, the Court noted that the criminal offense defined in section 1326 did not limit prosecution only to cases where the underlying removal order was lawful. *Id.* The Court held that that was not good enough: "where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." *Id.* at 838.

Subsection (d) "was Congress's attempt to comply [with] the Supreme Court's directive that [section] 1326 defendants be afforded an opportunity for 'some meaningful review of the administrative proceeding' before it is used as a basis for their criminal

convictions." *Zapata-Cortinas*, 2018 WL 6061076, at *8 (quoting *Mendoza-Lopez*, 481 U.S. at 837-38). It describes how a person charged with illegally reentering the country can collaterally attack his prior removal. The language of the statute suggests that Congress intended subsection (d) would be the *only* way to challenge the underlying removal. *See* 8 U.S.C. § 1326(d) ("In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order . . . unless [she satisfies the three requirements].").

Rangel argues that section 1326(d)'s requirements should not apply here because the NTA underlying his removal was defective and never vested the immigration court with jurisdiction. Rangel asserts that subject-matter jurisdiction is nonwaivable and that a jurisdictional defect necessarily rendered the removal proceedings null and void. He cites *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982), a case about personal jurisdiction, for the proposition that a "defendant is always free to ignore [ ] judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." In effect, Rangel argues the Court's use of the word "always" unambiguously opens an alternative pathway to section 1326(d) for challenging a removal order issued without jurisdiction. *Cf. Tzul*, 345 F. Supp. 3d at 788 ("*[A]ny* judgment may be collaterally attacked if it is void for lack of jurisdiction." (internal quotation marks omitted) (quoting *Jacuzzi v. Pimienta*, 762 F.3d 419, 420 (5th Cir. 2014))).

But Rangel's argument goes too far. Although a jurisdictional defense generally is not subject to forfeiture, the Seventh Circuit has held that a *collateral* challenge to

subject-matter jurisdiction may be unavailable in circumstances where parties had a full opportunity to litigate the issue and a final order has been entered. *See, e.g.*, *In re Factor VII or IX Concentrate Blood Prods. Litig.*, 159 F.3d 1016, 1019 (7th Cir. 1998) (expressing doubt that a class-action settlement "could be set aside" despite potential subject-matter jurisdictional defects in the original proceeding and noting that "[a]fter a case has become final by exhaustion of all appellate remedies, only an egregious want of jurisdiction will allow the judgment to be undone by someone who, having participated in the case, cannot complain that his rights were infringed without his knowledge"); *In re Edwards*, 962 F.2d 641, 644-45 (7th Cir. 1992) (noting, in the bankruptcy context, that "[w]ant of subject-matter jurisdiction is not waivable—until the loser has exhausted his appellate remedies, after which courts will not treat the judgment as void unless the jurisdictional error is egregious"); *see also O'Sullivan v. City of Chicago*, 396 F.3d 843, 857-58 (7th Cir. 2005); *Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940); *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928).

Rangel has not been deprived of his opportunity to collaterally challenge the subject-matter jurisdiction of the underlying immigration proceeding. Rather, Congress has enacted specific procedures and requirements—as the Supreme Court put it in *Mendoza-Lopez*, "some meaningful review of the administrative proceeding," 481 U.S. at 838—to make such a challenge collaterally. The Court concludes that the requirements of 8 U.S.C. § 1326(d) must be satisfied for the indictment to be dismissed.

### 2. Rangel cannot satisfy section 1326(d)'s requirements

To prevail, Rangel must show that his challenge satisfies the three elements of

subsection (d)—exhaustion, deprivation of judicial review, and fundamental unfairness. *See* 8 U.S.C. § 1326(d); *United States v. Larios-Buentello*, 807 F.3d 176, 177 (7th Cir. 2015); *United States v. Baptist*, 759 F.3d 690, 695 (7th Cir. 2014). Given the conjunctive language of the statute and controlling precedent, a defendant's failure to satisfy any of the three defeats a motion to dismiss. *Baptist*, 759 F.3d at 695 ("While we have yet to expressly state that all three requirements must be met before an alien can successfully collaterally attack a prior removal, we have implied as much.").

Rangel argues that he has satisfied—or is exempt from—each of the three requirements. The government contends that he has satisfied none of the three.

### a. Exhaustion

First, Rangel must show that he "exhausted any administrative remedies that may have been available to seek relief against" the previous order. 8 U.S.C. § 1326(d)(1). He argues that this requirement ought to be waived because administrative review would have been futile and because the underlying proceedings were void. He cites the Seventh Circuit's recent opinion in *Mejia Galindo v. Sessions*, 897 F.3d 894 (7th Cir. 2018), in which the court held that the Board of Immigration Appeals lacked jurisdiction to institute a removal order in the first instance. Rangel argues by analogy that he is exempt from the exhaustion requirements because, "by acting in the absence of jurisdiction, the immigration judge's order was ultra vires" and thus a "legal nullity." Def.'s Br. in Supp., dkt. no. 8, at 11-12.

In other words, Rangel asks this Court to embrace an exception to subparagraph (d)(1). This position finds some support in decisions by district courts in other circuits. *See, e.g.*, *Erazo-Diaz*, 2018 WL 6322168, at *5 (applying Ninth Circuit precedent to

excuse a defendant from administrative exhaustion requirements); *United States v. Rodriguez-Rosa*, No. 3:18-CR-00079-MMD-WGC, 2018 WL 6635286, at *8 (D. Nev. Dec. 11, 2018) (same).

But Seventh Circuit authority binds this Court. And the Seventh Circuit has held that no exception applies to the administrative exhaustion requirement in section 1326(d)(1). *See Larios-Buentello*, 807 F.3d at 177. In *Larios-Buentello*, a defendant appealed his conviction for illegal reentry and sought relief despite his failure to exhaust administrative remedies. The defendant argued that administrative review would have been futile because the case upon which his appeal was primarily predicated had not yet been decided by the Supreme Court when he was originally ordered removed.[5] *Id.* The Seventh Circuit rejected this argument, noting that "an administrative appeal was available, even if unlikely to succeed" under prior law. *Id.* The court emphasized that a change in the law could not provide a basis to waive the requirements of section 1326(d)(1) because, had the defendant pursued review, he may have been the one whose case prompted the Supreme Court's landmark decision. *Id.* at 178. Ultimately, the court held that even administrative remedies unlikely to succeed under prior law must be exhausted for a defense to lie under section 1326(d)(1). *Id.*

Although *Larios-Buentello* is not a perfect fit here, its reasoning defeats Rangel's contention. Specifically, the Seventh Circuit's broad reasoning rejected an implicit exception to the exhaustion requirement. *Id.* And, perhaps most persuasively, the court did so in a context analogous to this one, where the defendant's claim was weak at the time he failed to appeal but perhaps became stronger based on an intervening Supreme

---

[5] The case was *INS v. St. Cyr*, 533 U.S. 289 (2001).

Court decision. This Court cannot ignore *Larios-Buentello*'s binding authority.

At oral argument on this motion, Rangel's attorney raised an alternative theory: he may not have been aware that he had administrative remedies available. The record is less than clear on this point. The government points to a couple of statements in documents from Rangel's immigration file that suggest he acknowledged the removal order and did not wish to reopen or otherwise challenge the determination. If the government was responsible for communicating Rangel's administrative remedies to him, there is a good chance it would lose on this paltry record. But it bears no such responsibility. The Seventh Circuit has made clear that "[i]n immigration law, as in tax law—and criminal law, too, where knowledge of the law is presumed—the Constitution permits the government to leave people to their own research." *Deminski v. INS*, 275 F.3d 574, 578 (7th Cir. 2001); *see also United States v. Alegria-Saldana*, 750 F.3d 638, 641 (7th Cir. 2014) ("[A]liens are presumed capable of researching generally available remedies."). Rangel's argument therefore lacks merit.

In sum, Rangel did not exhaust his administrative remedies to challenge the underlying removal proceeding as required by section 1326(d)(1). The Seventh Circuit has foreclosed his proposed exception to that requirement.

### b. Deprivation of judicial review

If Rangel could satisfy the administrative exhaustion requirement, he would still need to demonstrate that "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). This statutory language is more or less directly adopted from *Mendoza-Lopez*, which further explained that some "abuses could operate, under some

circumstances, to deny effective judicial review of administrative determinations." 481 U.S. at 839 n.17.

Rangel again argues that he automatically satisfies this requirement because the immigration court never had proper jurisdiction. He argues that this is precisely the type of abuse depriving a defendant of "effective judicial review" of which *Mendoza-Lopez* warned.

But, again, *Larios-Buentello* defeats this argument. There, the Seventh Circuit held that it was the defendant's own choice not to administratively appeal his removal determination that "also prevented a request for judicial review." *Larios-Buentello*, 807 F.3d at 177. Just as the defendant in *Larios-Buentello* could have appealed and argued for a change in existing law, so too could Rangel have moved to reopen his removal case, appealed to the BIA, and eventually gained review by an Article III court. At each stage of the process, he could have argued that the 2010 NTA was defective and thus undermined subject-matter jurisdiction. He did not. And, as the court in *Larios-Buentello* held, the relative unlikelihood of his success in making such arguments is no basis to excuse the requirement. *Id.* (explaining that a belief that any appeal would have failed "does not make the opportunity 'unavailable'" for the purposes of section 1326(d)(2)"); *cf. United States v. Arita-Campos*, 607 F.3d 487, 493 (7th Cir. 2010) (holding that sufficient recourse to judicial review exists to undermine a defendant's defense under 1326(d)(2) "as long as he has recourse to relief through a petition for habeas corpus.").

Rangel has failed to demonstrate that he was deprived of judicial review.

### c.     Fundamental unfairness

Finally, under the third section 1326(d) requirement, Rangel must show that the underlying removal order was "fundamentally unfair."  *See* 8 U.S.C. § 1326(d)(3).  "To establish fundamental unfairness, a defendant must show both [1] that his due process rights were violated and [2] that he suffered prejudice from the deportation proceedings."  *Arita-Campos*, 607 F.3d at 493.  "Prejudice," in this context, requires that "a defendant . . . prove that judicial review would have yielded him relief from deportation."  *Id.* (internal quotation marks omitted).

Again, Rangel's arguments are intertwined with his jurisdictional contentions flowing from defects in the 2010 NTA.  First, he asserts that the jurisdictional defect is a "fundamental procedural error" that amounts to a due process violation under the Supreme Court's decision in *Kwong Hai Chew v. Colding*, 344 U.S. 590, 597 (1953), which expounded the minimum notice and hearing requirements required by due process in removal proceedings.  He then suggests that the prejudice element should be waived because jurisdictional issues distinguish this case from relevant precedent.

Rangel spends most of his energy again attempting to analogize his case to *Mendoza-Lopez*.  There, the Supreme Court held that "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review."  *Mendoza-Lopez*, 481 U.S. at 842.  But *Mendoza-Lopez* is, at least for this purpose, readily distinguishable.  For one thing, in *Mendoza-Lopez* the government did not appeal the Eighth Circuit's decision that the underlying deportation proceeding "was fundamentally unfair" and thus violated the defendants' due process rights.  *Id.* at

834 n.8. It disputed *only* "whether a federal court must *always* accept as conclusive the fact of the deportation order, even if the deportation proceeding was not conducted in conformity with due process." *Id.* at 834. Thus the Court addressed only whether a collateral attack must be allowed in some circumstances. After concluding that *some form* of collateral attack must be available to satisfy due process, the Supreme Court simply affirmed the lower court's dismissal without addressing whether the underlying proceeding violated the defendants' due process rights (which, again, the government had not appealed). *Id.* at 842.

Here, in contrast, no one contests that, under the appropriate circumstances, the removal order underlying a charge under section 1326(a) may be attacked collaterally. Indeed, both parties structure the bulk of their arguments around section 1326(d), which codified *Mendoza-Lopez*'s limited mandate that "an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." *Id.* at 838. *Mendoza-Lopez* is therefore largely unhelpful in answering the substantive question of whether Rangel can demonstrate fundamental unfairness.

Beyond his *Mendoza-Lopez* argument, Rangel also suggests in his reply brief that the fact he was deported *in absentia*, combined with the jurisdictional issues discussed above, renders the underlying order fundamentally unfair. But, as the Seventh Circuit has explained, removal *in absentia* does not necessarily violate due process. *Smykiene v. Holder*, 707 F.3d 785, 786-87 (7th Cir. 2013). Where, for instance, a noncitizen receives notice of a removal hearing and waives her right to it by failing to appear, no violation has occurred. *Id.* Notice that is served by mail to the address provided to

immigration authorities is presumed effective unless the petitioner presents evidence that it never reached her. *See id.*; *Mauricio-Benitez v. Sessions*, 908 F.3d 144, 149 (5th Cir. 2018). On the other hand, "if [a petitioner] never received the notice, there is no waiver and so [she] is entitled to reopen the removal proceeding to enable [her] to contest removal 'at any time.'" *Smykiene*, 707 F.3d at 786-87 (quoting 8 U.S.C. § 1229a(b)(5)(C)(ii)). Likewise, the statute provides that a person who was "in Federal or State custody" may move to reopen a removal order imposed *in absentia* if she was unable to appear. 8 U.S.C. § 1229a(b)(5)(C)(ii).

The Seventh Circuit has held that the proper way for a defendant to challenge a removal order imposed *in absentia* is by "fil[ing] a motion to reopen and explain[ing] if he had a justifiable reason for failing to appear." *United States v. Beckford*, 640 F. App'x 558, 561 (7th Cir. 2016). The record is clear that Rangel never petitioned to reopen after the 2012 removal order. The record further suggests that he accepted the immigration judge's order for removal and that he declined to make a statement contesting the removal determination, though counsel raised, during oral argument in this case, concerns about the conclusiveness of that evidence. Regardless, the uncontested portions of the record are sufficient to conclude that Rangel's removal *in absentia* did not violate his due process rights.

Finally, the prejudice element is also dispositive. In his opening brief, Rangel seems to suggest that he was denied mandatory relief from removal—apparently in the form of a jurisdictional dismissal by the immigration judge—and that this denial satisfies the prejudice requirement. But in his reply brief, he retreats from that position, instead

suggesting that the prejudice requirement should be waived, again for fundamental unfairness reasons.

Based on the briefs and oral argument, the Court is not persuaded. As discussed above, even assuming that the 2010 NTA was defective, Rangel must satisfy the requirements of section 1326(d) to collaterally attack the underlying removal order. One of those requirements is fundamental unfairness, which under controlling authority requires a showing of prejudice. *See Arita-Campos*, 607 F.3d at 493. Rangel's argument that the prejudice requirement should be waived is conclusory and does not grapple with that authority. It therefore fails.

In sum, Rangel has failed to demonstrate that his removal proceedings were fundamentally unfair within the meaning of 8 U.S.C. § 1326(d)(3).

## Conclusion

For foregoing reasons, the Court denies defendant's motion to dismiss the indictment [dkt. no. 8].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 12, 2019